We are going to begin with case number 23-1816, Amanda Rakes v. Jonathan Roederer et al. We are going to begin with oral argument from Ms. Landedwich. Thank you, Judge. Good morning. My name is Laura Landedwich, and I represent the estate of Amy Lynn Slaymaker and her surviving minor children. The estate asserts a substantive due process claim against officers of the Charlestown Police Department. This case comes to the court on appeal from summary judgment. When the court long ago established a three-part test for evaluating when there is a substantive due process right to be free from government intervention that creates a danger, the test actually predates the Supreme Court's decision in De Cheney, which most circuits rely on when addressing these claims. The three-part test requires that a state actor commit an affirmative act that increases or creates a danger to a private citizen, that the affirmative act of that state actor proximately causes harm to a foreseeable victim, and that the conduct shocks the conscience, which this court has variously described as a deliberate indifference standard. In this case, officers committed at least five affirmative acts. They showed R.J. Slaymaker a photo from Amy Lynn's phone with a gun to his head. Showing him that photo sent him into a rage and a tirade about whether his gun rights were going to be revoked as a result of that photo. He went so far as to tell officers that he would rather them kill him now than them show that photo to other authorities that might take his guns away from him. In response to R.J.'s tirade, the officers made a deal. They said, the law requires us to take you to the hospital and commit you for 24 hours. It requires us to fill out paperwork and tell folks at the hospital everything that happened here tonight. We won't do that. We will not show them this photo if you agree to go voluntarily so that we don't have to fill out those paperwork. R.J. eventually agreed. So then the officers called EMS. They told EMS that there was an argument, not that there was a violent fight involving guns. And they told EMS that R.J. was voluntarily going to be evaluated for his mental health. They did not mention the guns. They did not mention the claims from Amy Lynn that R.J. was threatening to kill her family if she would not engage in sex acts with other men. None of that was disclosed. They did not disclose that the reason that R.J. and Amy Lynn were in this neighborhood was because he had threatened to kill her children because she didn't have sex with someone he wanted her to have sex with. So R.J. goes to the hospital and the hospital records, predictably, show he's not homicidal, he's not suicidal. He just had an argument. He's drunk. He's a .12 at the hospital, but he's free to go as soon as he's evaluated, which he does. Meanwhile, the defendants, in their fourth act, told Amy Lynn that R.J. was going to be in the hospital on a 24-hour hold. Now there's a lot of discussion in the record about whether Amy Lynn was going to return to the family home versus go to her parents' house. And there are statements going both ways in these rather convoluted conversations that But at the end of the day, the officers knew that Amy Lynn was returning to the family home to retrieve her dog and her belongings. How about the guns? And the guns. And the guns. And left her to do that on her own. She repeatedly asked whether there was a 24-hour hold on R.J. Repeatedly. I see three instances of that in the record. There's two conversations with the officers. Then the topic arises again when she gets to the police station to have her injury photographed. And there are varying degrees of certainty. Correct? Well, what is actually recorded on the audio is that she says, you said it's a 24-hour thing, right? And the officer responds, yes. Now, some of the audio is inaudible. So we don't know where, we don't have that initial representation. But Officer Johnson doesn't say, no, that's not what I said. She says, you said it was 24 hours. And he says, yes. Given the procedural posture of the case, no depositions, right? No, there have been depositions in the case. There have? Yes. Wasn't this a 12 days? This is here on a summary judgment. It was on summary judgment. I'm sorry. Yes. Mixing it with another case. Part of the gap in the record is due to the fact that Officer Johnson passed away before this litigation was filed. So the only, other than the recordings of that evening, the only other evidence is his report. Could you speak to the issue of your decedent's time death? From the record, I had difficulty determining whether it was that same evening before morning or whether it was actually the next evening. The bodies were discovered the next evening. Amy Lynn's body was cold to the touch. Investigators surmised that she had been dead for several hours. The door to the family home had been kicked in. So the reasonable assumption is that R.J. came home after being discharged at 3.30 a.m. What time did he send the suicide note text message? That was around... He sent a note to his mother, right? Yes. Saying that I've just killed my wife and I'm sorry I'm going to kill myself. Well, he didn't say he just killed her, but he did at about 7 p.m. Shot her or something? At 7 p.m., he said, I killed Amy Lynn. She screwed me. 7 p.m.? Yes, the following day. Amy Lynn was found in bed holding a phone. It looked like she was attempting to call for help and shot in the head with the AR-15 rifle. And do we know, was that AR-15 at the house? Because he, R.J., had a Glock that was in his lap, correct? And that's what he used to kill himself. Yes, but they had several guns in the house. The police confiscated the one handgun that he struck her with the night before, but left, instead of collecting the guns from the house, as they had initially talked about doing, they were too apprehensive to go into a house of a domestic abuser that has AR-15s. Did they have authority to go in the house and get those guns at that point? They did, Your Honor. In fact, Amy Lynn requested that they do that. I see. So we do have a situation in effect where they set it, in your view, they set it up so that the victim had to go and get the guns rather than they did. Exactly. And they also set it up so that they had an easy way out with the gentleman involved, R.J. Yes, Your Honor. Okay. And while Amy Lynn believed that she had 24 hours, the defense position is that she should have run home, grabbed the guns as fast as she could, and left the house. But that is not the arrangement that was discussed with her and the police. And the police, despite having multiple occasions to tell her, R.J. was not going to be in the hospital for 24 hours. They could have told her that, yeah, you need to act quickly. Ms. Leibowitz, can you help me with your understanding of the facts? I mean, it's impressive. I'm sure co-counsel knows it well, too. When Amy Lynn went to the police department to be photographed, showing the injuries to her body, there was a police report subsequently prepared, correct? Yes. And that police report is more declarative with respect to the time period at which R.J. could be released from the hospital. I know that you could very easily see this as a disputed fact at the Rule 56 stage. Is that police report properly considered on summary judgment? Well, Your Honor, I mean, I think it is. I think because the declarant is deceased, it would be admissible. But I think that the— Admissible at trial? Correct. On what theory? It's a business record. Are you sure our law is that clear on that? Well, maybe I should check that. But in either event, whether it comes in or not, the statements that are in that report were drafted after the murders and after Officer Johnson knew about the murders and contain multiple misrepresentations about the circumstances. And at a time when Officer Johnson is certainly aware of where the murders occurred. Yes. Yes. And, in fact, at one point he told dispatchers when they were investigating the home before the murders that she must have gone back to him. I told her to go to her parents' house, but she must have just gone back to him. And so he was quite aware of what happened. Before time gets away, why don't you address qualified immunity? If the panel were to agree with you that there is a genuine issue of material fact, what's your response to the qualified immunity determination? Okay, so if the issue is whether this right was clearly established, this court's precedent clearly establishes that in the cases of Monfils v. Taylor and Wallace v. Adkins. In both of those cases, a victim was put in a heightened sense of danger,  failed to mitigate the risk by telling them the reality of their situation. In Monfils, the action was that the police chief said, a recording of your report is not going to be released, but then did nothing to prevent its release. He didn't actually release it. He just did nothing to prevent it. In Wallace v. Adkins, although it was decided there was a causation issue in that case, the court clearly said that a false representation of protection is an affirmative act that can give rise to liability on these claims. And so for those reasons, this right is clearly established, and this court should have no problem finding that there's no qualified immunity. We have some cases, other circuits have some cases, that talk about closing other avenues of self-help. Did the police here close other avenues of self-help? In Monfils v. Taylor, the court clarified that closing other avenues of self-help only applies to in-custody claims. It is not an appropriate calculation when you're looking at a state-created danger claim. So you think Monfils really cabins that particular criterion that much? It does. In fact, it explicitly says that the holding in Wallace v. Adkins is the law, and that other holdings to the contrary misstated that law. In Loomis, though, the court returns to the concept, to the principle that Judge Ripple is referring to, and says that Reed is an example of a case where there was a limitation on self-help. And I think Reed goes exactly to the point that you're just making. Reed is the situation where the police gave the car keys to somebody that they knew was drunk. So my only point is I'm not so sure that our circuit precedent is that clear after Monfils about the limitation on self-help in light of Loomis. Well, Judge, I think Loomis was factually—all of these cases, and it's acknowledged in Loomis as well, are very fact-driven. Right, but I—go ahead, continue. I'm sorry. The case in Reed was that there was the affirmative act of leaving a drunk driver in the car, and that that created a foreseeable risk to other people on the road. It really wasn't a matter of restricting access to other forms of self-help. Right. I understood your position correctly, if I'm wrong, that if the court wants to look at a limitation on self-help, it is satisfied here. It's satisfied in light of the misrepresentation that Officer Johnson made to Amy Lynn Slaymaker, and it's satisfied by omission akin to Monfils by taking no care to either escort her to her home or make sure that she ended up at her parents' home that way. So even if it's part of the law, might it not be satisfied here? I think that's right, Your Honor. Amy Lynn had done a very good job of protecting herself and her family up until this point, and the misrepresentations from the police about the circumstances caused her to let her guard down. And there's no reason to believe that she wouldn't have been vigilant had she known the true circumstances. Thank you, Ms. Landon, which will be giving you a short rebuttal time. Thank you, Judge. We're now, Mr. Kivitz, going to move to you. Good morning. May it please the court. This is obviously a very tragic murder, and we understand and acknowledge that Amy Lynn Slaymaker's family, in their grief, want to hold someone other than R.J. responsible for her death. Arguably, in no other area of the law are the underlying facts as heartbreaking as they are in state-created danger cases. In Descheny, it was alleged that social services did not do enough to prevent horrific child abuse. In Arlington Heights v. Doe, the allegations were that the police did not do enough to stop a man from sexually assaulting an intoxicated teenage girl. And in Sandage v. Commissioners of Vanderbilt County, the plaintiff claimed that the sheriff's department could have prevented the brutal murder of a woman by a known criminal out on a work-release program. The estate claims, as the plaintiffs did in Descheny, Doe, and Sandage, that the state should have done more to prevent this horrific tragedy. But federal courts simply do not recognize these types of constitutional claims. As the Supreme Court emphasized in Descheny, the purpose of the Due Process Clause is to protect the people from the state, not to ensure that the state protects the people from each other. As you just heard, plaintiff nevertheless contends that defendants' actions fall squarely within the state-created danger theory of liability. But plaintiff cannot meet any of the three elements necessary to support such a claim. And even if plaintiff could, as the district court correctly determined at summary judgment, there is no clearly established law that put defendants on notice in July of 2019 that their conduct violated the Constitution, and therefore defendants are entitled to qualified immunity. First and foremost, plaintiff cannot show that defendants' actions created or increased a danger to Amy Lynn. It is undisputed that R.J. was abusing and threatening Amy Lynn for six to eight months before defendants' interactions with them. During that time, R.J. shot at Amy Lynn, choked her, threatened to kill her, and threatened to burn her house down. We know in March of 2019 that Amy Lynn shot at R.J. after he tried to choke her to death. And most alarming, on July 10, 2019, nine days before her death, Amy Lynn wrote and signed a letter outlining some of the abuse that I just mentioned and told the authorities that if it was found, that they should be looking at R.J. As in Doe, this is not a case in which Amy Lynn was safe or even considerably safer before defendants acted. The defendants' conduct did not turn a potential danger into an actual danger. It's the exact opposite. Amy Lynn was in serious, actual mortal danger before the defendants ever interacted with her in July of 2019. Defendants simply could not have created a danger that had already existed for months and would have continued to exist had they never intervened. Indeed, the estate acknowledges as such, as it concedes, it is likely that R.J. would still be a threat to Amy Lynn 24 hours after their encounter. Furthermore, the estate's specific contention that defendants, and I'm quoting, affirmatively placed Amy Lynn in a heightened state of special danger she would not have otherwise faced when they falsely told Amy Lynn that R.J. would be in the hospital for 24 hours and it was safe to go home. Isn't that something we need to consider? Heightened state of immediate danger. Yeah, this guy was going to be a problem for this lady for a long, long time. But she wasn't going to encounter him in that house that night with those guns unless the police had set her up. I think Plaintiff's position is legally and factually flawed. On the legal side, even if Defendant Johnson did tell Amy Lynn that she would be safe for 24 hours in her home, false assurances of protection are not affirmative acts that trigger the state created danger. How about mom fills? Excuse me? How about mom fills? Well, in mom fills, it was actually in part the court found that it was the act of releasing the tape that created the danger, that turned a potential danger into an actual danger. And I think that's what we focus on when we look at Sanders versus Vanderbilt County. But here we have the act of setting it up so that this guy's out within a couple of hours of his arriving at the hospital. If the police had bothered to do the paperwork, he would have been in that hospital at the time he killed her. Why isn't that like setting the setup up with the tape? How do you distinguish the two? I think that the recorded evidence in this case makes clear that defendants did not make a promise or assurance that Amy Lynn would be safe at her home for 24 hours. Officer Roederer never said anything to Amy Lynn about that. And Officer Johnson merely said yes to whether or not it was a 24-hour thing. And in the same sentence said, but you're going to go to your parents, get the guns, and go home. At most, the reasonable inference could be that she was safe when she went to her parents' house, not when she was at her home. Did you have for a jury to decide? No, I don't think that you can take that much of a reasonable inference when you look at it from the totality of the circumstances. Officer Johnson spent almost an hour with Amy Lynn talking to her about what she should do and why she should get out of her house and go to her parents' house and take the guns. How about the conversation then that occurred back at the station? That seems to be far less clear with regard to the 24 hours. Well, I think the conversation that took place back at the station, Officer Johnson in his report, he's now deceased, clearly stated that it was not going to be 24 hours and that he directed her to go to her parents' house. Can I return to Monfils? Yes. So, the operative actor in Monfils, right, is Detective James Taylor. Yes. Do we agree on that? I do. Okay. And in the portion of our opinion where we're talking about the state-created danger, the reason I'm pressing you on this is Taylor, either as you mentioned or Slandovich mentioned, Taylor's not the one that released the tape, right? As a matter of fact, he didn't. Someone else at the department did. Taylor failed to take steps to ensure that it didn't get released. Right. Right. Right. Exactly. Okay. But when we describe why there was a state-created danger, we said Taylor created a danger, and by assuring Hitt, Hitt was the district attorney, that he would make sure the tape was not released but not following through. So, he created a danger Monfils would not have otherwise faced. So, yes, it's not the exact same fact pattern. They never are. Okay. How does the reasoning there, though, not map over here? In other words, you were kind of painting it. I don't want to put words in your mouth. You can correct me. You were kind of painting it as, ah, this is pretty far afield from Monfils. And when I look at it, I say, it's pretty close, actually. I agree. I think Monfils is their best case. But Monfils does not clearly establish that the defendant's conduct here violated Amy Lynn's rights. Okay. And then just tell me why. Why, in your view, is that the case? Because the key part in Monfils was the action of releasing the tape. That is, the chief tailor not ensuring that it didn't get released after telling the prosecutor and Monfils himself that it would not be released. Okay. So, can I hit you with one more question? Yes, of course. Okay. So, by analogy, why, therefore, here, is it not Officer Johnson's failure to make sure either that Amy Lynn has a clear understanding of the situation on which he went to the hospital voluntarily, or that he failed to take a step to make sure that she wasn't at that house during that period? In other words, by driving her to her mother's house, you know, something along those lines. I mean, I think with the benefit of hindsight, Officer Johnson certainly could have done more. But the, you know, failure to fulfill a promise that it would have been done, that she would have been safe for 24 hours, is essentially a failure to protect. Right, right. But failure to fulfill a promise was the epicenter of the reasoning in Monfils. Because Detective Taylor – right or wrong? I mean, you could say, look, Monfils is – maybe you'd say Monfils should be overruled because it really is a problem with the Cheney. But it's our case law. Then the primary difference is in Monfils, Monfils was not in actual danger before the failure to release this tape. While here – Contrast those two. What level of danger was Monfils in prior to the release of the tape versus what level of danger was Amy Lynn in from our jam? Monfils was in potential danger, and it turned into an actual danger after the failure to keep the videotape in-house in the police department. Was he even – would it even be characterized correctly as potential? Because at that juncture, the investigation is going on, and the individuals who ultimately were convicted of the murder, there wasn't connection between them and Monfils, correct? I think that's fair, yes. Well, there was some connection because they all worked together, and that was what happened. But – Were there preexisting threats against Monfils from the individuals who were convicted? There were not because they had no idea who Monfils was and that he was responsible for turning the suspect in over to the police. Yeah, and that was the whole point of the tape. I mean, they didn't have any idea. The guy didn't have any idea who reported him. That's exactly right here. And again, the main difference between Monfils and this case is that Officer Johnson did not take a potential danger and turn it into an actual one. We know for six to eight months beforehand that R.J. was threatening, abusing, shot at her, and that she was, in essence, in mortal danger. So what is a little distressing, though, or what I'm trying to figure out is kind of where the legal line is here. These are my words, not yours, okay? What you're saying is that she was in a disastrous situation before – right? This is a very, very, very delicate and dangerous situation she's in, given her – before the police show up that night, all that. But is it – are you going so far as to say, and therefore, the risk to her life was kind of inevitable? There's just really nothing – there's nothing a police officer could have done that would have put her incrementally in more danger. It was a disaster from a danger perspective, unfortunately, sadly, tragically. Unfortunately, that's true, and yes, that's what we're saying. So it's a – so the core of it's kind of a proximate cause. They just really couldn't have done anything to create incremental danger. Correct. I mean, and I'm focusing on the three-part test, which is focused initially on whether or not we created or increased the danger to her. She was already in mortal danger beforehand. How, because of the defendant's actions, did we increase what was already in mortal danger? Okay, and then what's your best response to the point that Judge Ripple was making about – well, hold on. They may have – it starts as a disaster, but they may have heightened it a little bit. You know, Judge Ripple's comment about this particular house on that particular night with those particular guns there. Well, I think first you have to assume that Officer Johnson did tell Amy Lynn that she would be safe at her home for 24 hours in order for that to be a heightened state of danger. But I don't think that there's actually a heightened state of danger within that 24 hours. She was already in fear and had been threatened with death beforehand. Do you want us to spend a minute on qualifying immunity? Sure, and I want to go back to the three cases that the plaintiff primarily relies upon, which is Payne, Reed, and Monfils. And particularly, neither one of those cases do I believe puts Officer Johnson on notice that his actions violated Amy Lynn's constitutional rights. Sandage, I think, is a case that we should really look at here because it indicated that Monfils may well have been superseded by Castle Rock. In Castle Rock, the police refused to enforce a domestic abuse restraining order despite repeated attempts by the woman against whom the husband the order was directed. And he ended up murdering the couple's three children. Yet the Supreme Court held that that refusal to arrest was not a denial of due process. The court noted in Sanders, and I'm quoting, It is hard to see what difference there is between a statute that commands enforcement and the promise not to endanger Monfils by revealing that he was the informant. In both cases, there is a commitment to protect. And if the statutory commitment is not enforceable under the 14th Amendment, it is difficult to see why a promise should be. So thus, Sandage supports that a false promise of protection does not rise to the level of a due process violation. And nothing, in our opinion, in any of the cases that plaintiff cites put defendants on notice that they violated clearly established law. Thank you. Thank you, Mr. Kivitz. Ms. Landon, which will go back to you for two minutes for rebuttal. Counsel, at some point, could you just briefly state your position with respect to that statement of the police officer at the police station during the subsequent visit? Yes, Your Honor. That creates a fact issue, as you pointed out and pointed out in previous opinions. The report from Officer Johnson says that Amy Lynn asked several times how long R.J. was going to be in the hospital. What that tells us is that she was concerned about how long he was going to be there. Now, in his self-serving report, he says, we told her we did not know. Not that he could leave at any time, which is what they told him and what was the reality of the case. And we know that at least on tape, he told her 24 hours at least twice. Do we know the time of that statement? She contacted him. The phone records show that she called the police station at 1.33 a.m. Her home is about 15 minutes away, so I would estimate somewhere between 1.45 and 2 a.m. Thank you. I just want to point out this issue about whether Amy Lynn was destined to be murdered by R.J. It's offensive to all notions of autonomy and resilience of domestic violence survivors. But it's not true to say that Monfils was not in danger before the tapes were released. Develop that. Why not? The reason that he was contacting the police, asking for assurance that the tapes would not be released, was because the eventual murderer was looking for the snitch. And he was talking at work about what he was going to do when he found out who snitched on him. He was in danger. He was actively seeking out the person who made the report. Well, that's the time frame between the report and the death. What about before the report? That Monfils wouldn't have been on the murderer's radar at that point. He wouldn't have, but that was not a state action. Monfils is the one that, on his own volition, contacted the police to make the report. That was his choice. He chose to put himself in that position. What he did not choose was to put himself in a position where his identity was revealed to the murderer. And that is the same thing with Amy Lynn. She did not choose to put herself in a position where she was at home, believing that R.J. had been put away for the remainder of the night and she was safe. If there are no more questions. Thank you very much, Ms. Landowich. Thank you very much, Mr. Kivitz. The case will be taken under advisement. Thank you.